Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL II

| | | |
|---|---|---|
| CARLOS A. CRUZ CABÁN<br><br>Parte Apelante<br><br>v.<br><br>BRISTOL MYERS SQUIBB<br><br>Parte Apelada | TA2025AP00636 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Humacao<br><br>Caso Núm. HU2022CV01372<br><br>Sobre: Despido Injustificado (Ley Núm. 80), Discrimen (Ley 100), Ley de Represalia en el Empleo (Ley Núm. 115-1991), Procedimiento Sumario (Ley 2) |

Panel integrado por su presidenta la Jueza Cintrón Cintrón, el Juez Rodríguez Flores y la Jueza Díaz Rivera.

Rodríguez Flores, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 11 de marzo de 2026.

Comparece ante nosotros, el Sr. Carlos A. Cruz Cabán (señor Cruz Cabán) mediante recurso de apelación y solicita que revoquemos la Sentencia dictada el 16 de octubre de 2025, y notificada el 17 de octubre de 2025[1], por el Tribunal de Primera Instancia (TPI), Sala Superior de Humacao. Mediante el referido dictamen, el foro primario desestimó sumariamente y con perjuicio la demanda por despido injustificado y discrimen por edad incoada por el señor Cruz Cabán contra Bristol Myers Squibb (Bristol).

El 7 de enero de 2026, Bristol presentó su oposición a la apelación.[2]

Examinados los escritos a la luz del derecho aplicable y por los fundamentos que expondremos a continuación, se *confirma* la *Sentencia* apelada.

---

[1] *Sentencia*, SUMAC en el recurso HU2022CV01372, entrada 44.
[2] *Alegato en Oposición a [la] Apelación*, *Íd.*, entrada 3.

**I.**

El 6 de octubre de 2022, el señor Cruz Cabán incoó una *Querella* contra Bristol, alegando despido injustificado, discrimen por edad y represalias.[3]  Por su parte, Bristol contestó la querella el 1 de octubre de 2022[4] y negó que el despido del señor Cruz Cabán fuese injustificado, discriminatorio por su edad y represivo.

Luego de varios trámites procesales, que son innecesarios pormenorizar, el 17 de febrero de 2023, el TPI convirtió el trámite de sumario a ordinario.[5]

Entonces, luego de culminado el descubrimiento de prueba, el 8 de julio de 2024, Bristol presentó una *Moción de Sentencia Sumaria,* en la que argumentó que no existían controversias en los hechos materiales propuestos y que procedía desestimar la querella en su totalidad por insuficiencia de prueba.[6]  En primer lugar, articuló que el despido del señor Cruz Cabán fue uno justificado y obedeció a que éste erró dos veces en la documentación del tiempo y horario de la limpieza del *buffer* de una máquina el 15 de junio de 2020, lo cual se conoce como *backdating* y es contrario a las Good Manufacturing Practices (GMPs) regentes sobre la industria farmacéutica. También, Bristol enfatizó que esta no era la primera infracción cometida por el señor Cruz Cabán, debido a que tenía varias amonestaciones que obraban en su expediente laboral. En cuanto a la causa de acción de discrimen por edad, Bristol argumentó que el señor Cruz Cabán no estableció un caso *prima facie* bajo dicha causa de acción y, aun cuando se presumiera que el señor Cruz Cabán hubiera logrado establecer un caso *prima facie* de discrimen por edad, Bristol había logrado demostrar que el despido se debió a una razón legítima y no discriminatoria. Por

---

[3] *Querella*, SUMAC en el recurso HU2022CV01372, entrada 1.
[4] *Contestación a [la] Querella, Íd.*, entrada 7.
[5] *Minuta, Íd.*, entrada 19.
[6] *Moción de Sentencia Sumaria, Íd.*, entrada 32.

último, indicó que el señor Cruz Cabán no logró establecer un caso *prima facie* de represalias, toda vez que no presentó prueba de que su despido se debió a que este hubiera participado en una actividad protegida. Añadió que, en el supuesto que hubiese una actividad protegida, no existía un nexo causal entre la acción protegida y las acciones adversas supuestamente tomadas por Bristol.

En respuesta a ello, el señor Cruz Cabán presentó su oposición el 8 de agosto de 2024.[7] Alegó que existía controversia sobre hechos materiales que impedían la disposición sumaria del caso. Mencionó que tenía un buen historial de evaluaciones durante sus veinte años de empleado de Bristol; y que dos (2) de las amonestaciones referenciadas versaban sobre su asistencia y que solo una (1) de ellas concernía a su desempeño, siendo esta una remota, debido a que el evento que la motivó ocurrió en 2016. Razonó que su despido fue injustificado y arbitrario porque el error al documentar el horario de limpieza de la máquina no afectó a la compañía y otros que habían incurrido en cosas peores no habían sido separados de su empleo. Reiteró que fue objeto de discrimen por edad porque, luego de su despido, personas más jóvenes ocuparon su cargo. También, indicó que fue objeto de represalias en el empleo por razón de haber participado en la investigación interna realizada por Bristol en torno al proceso de documentación de horarios de limpieza de la máquina.

El 22 de agosto de 2024, Bristol replicó a la oposición del apelante.[8] Seguidamente, el señor Cruz Cabán duplicó el 9 de septiembre de 2024.[9]

Evaluados los escritos y los documentos que acompañaron dichos escritos, el 17 de octubre de 2025, el TPI dictó una *Sentencia*

---

[7] *Oposición a [la] Moción de Sentencia Sumaria, Íd.*, entrada 36.
[8] *Réplica a [la] Oposición a [la] Moción de Sentencia Sumaria, Íd.*, entrada 40.
[9] *Dúplica a [la] Réplica a [la] Oposición a [la] Moción de Sentencia Sumaria, Íd.*, entrada 42.

mediante la cual declaró ha lugar a la solicitud de sentencia sumaria presentada por Bristol y, consecuentemente, desestimó la causa de acción del señor Cruz Cabán en su totalidad, por insuficiencia de la prueba.[10] En su pronunciamiento, el foro apelado formuló las siguientes determinaciones de hechos:

> 1. BMS, es una empresa de manufactura de productos farmacéuticos y medicamentos ubicada en Humacao, Puerto Rico, altamente regulada por la Food and Drug Administration (FDA).
>
> 2. BMS cuenta con un sinnúmero de políticas que rigen tanto los procesos de manufactura como las relaciones de personal. Todas las posiciones de trabajo de manufactura en BMS conllevan el cumplimiento estricto y cabal con las Good Manufacturing Practices ("GMPs") y las Good Documentation Practices ("GDPs"), así como de los Standard Operating Procedures ("SOPs") establecidos por la Compañía, igualmente requeridos y aprobados por la FDA.
>
> 3. BMS adoptó para todos sus empleados un Manual de Referencia de Prácticas y Políticas de Recursos Humanos de BMS ("Manual de Referencia"); y políticas separadas sobre prohibición de discrimen en el empleo y represalias.
>
> 4. El señor Cruz Cabán inició sus labores como empleado temporero en BMS durante el mes de septiembre de 2000.
>
> 5. El señor Cruz Cabán comenzó como empleado regular de BMS un año después, el 17 de septiembre de 2001.
>
> 6. El señor Cruz Cabán ocupó los puestos de Operador de Manufactura, Manufacturing Technician I y Manufacturing Technician II.
>
> 7. La responsabilidad del señor Cruz Cabán como Manufacturing Technician II, el último puesto ocupado por el querellante previo a su despido, consistía en operar, monitorear, y/o alimentar equipo para la elaboración de productos farmacéuticos de acuerdo con GMPs y los SOPs, así como seguir los procesos de documentación adecuada.
>
> 8. Como Manufacturing Technician II, el señor Cruz Cabán era responsable de (1) operar y monitorear equipos para manufacturar productos farmacéuticos siguiendo las especificaciones establecidas por SOPs y las GMPs; (2) asegurar que toda la documentación relacionada con la operación y la limpieza de los equipos estuviese completa según lo requerido por las instrucciones de manufactura; (3) analizar los

---

[10] *Sentencia, Íd.*, entrada 44.

problemas en los equipos en las tecnologías especificadas y solucionar los problemas en dichos equipos y/o procesos; (4) limpiar y desinfectar los cuartos de manufactura y lavado, los colectores de polvo, contenedores de almacenamiento y equipos, de conformidad con los SOP's; y (5) realizar muestras de hisopos para verificar la limpieza del equipo y documentar toda la limpieza en el registro cronológico de limpieza.

9. El señor Cruz Cabán participó de entrenamientos anuales sobre distintos temas, incluyendo adiestramientos sobre las políticas de integridad de BMS, así como orientaciones sobre las políticas de prohibición de discrimen y represalias.

10. El señor Cruz Cabán recibía anualmente adiestramientos sobre las buenas prácticas de manufactura, o GMPs.

11. El señor Cruz Cabán fue adiestrado por BMS en los GMPs el 3 de diciembre de 2018, el 27 de septiembre de 2019 y el 5 de mayo de 2020.

12. El señor Cruz Cabán fue adiestrado por BMS en los GMPs relacionados con integridad de la data el 12 de marzo de 2018, el 14 de enero de 2019 y el 13 de enero de 2020.

13. El señor Cruz Cabán fue adiestrado por BMS sobre el SOP Good Manufacturing Practice Quality Risk Assessment el 7 de abril de 2020.

14. El señor Cruz Cabán fue adiestrado por BMS sobre las GDPs el 8 de marzo de 2019 y el 10 de febrero de 2020.

15. El señor Cruz Cabán fue adiestrado por BMS sobre el requerimiento anual de los GMPs el 8 de marzo de 2019, el 29 de mayo y 16 de junio de 2020.

16. BMS informa a sus empleados sobre la Política de Acciones Disciplinarias y Correctivas.

17. Las labores del señor Cruz Cabán como Manufacturing Technician II están reguladas por los GMPs y las GDPs.

18. Como parte de las buenas prácticas de documentación, el señor Cruz Cabán tenía que documentar todas las tareas y/o trabajos ejecutados operacionalmente. No cumplir con estas prácticas de documentación implicaba no cumplir con los GMPs.

19. Cumplimentar y firmar un formulario regido por los GMPs conllevaba reconocer y/o confirmar que la información documentada era precisa y cumplía con los requerimientos de las buenas prácticas de la manufactura. Era contrario a dichas prácticas documentar la ejecución de una tarea por adelantado ("backdating").

20. Los SOPs, que recogen las buenas prácticas de manufactura y de documentación, gobernaban las funciones y tareas que desempeñaba el querellante.

21. El SOP (Proc-002463) titulado Reglas de Buenas Prácticas de Manufactura en las Áreas Farmacéuticas regía el trabajo operacional del querellante en BMS.

22. Como Manufacturing Technician II, el señor Cruz Cabán debía ejecutar labores de limpieza de su máquina compresora, lo cual conllevaba varios pasos, incluyendo labores de limpieza de los "buffers" de dicha máquina.

23. La limpieza de la compresora debía documentarse, conforme establecido por BMS, al momento de su ejecución, indicando la fecha y la hora exacta que se estaba llevando a cabo cada paso.

24. El proceso de documentación de la limpieza de la compresora se llevaba a cabo en un "checklist". El "checklist" es un formulario que muestra una indicación de la fecha y hora en que fue impreso, la cual era marcada en el documento automáticamente por el sistema conocido como "DCA", un sistema controlado y programado bajo las buenas prácticas de manufactura.

25. La fecha y hora de impresión en cada página era la fecha y hora local en la planta de BMS.

26. Una vez impreso el *checklist* por el supervisor o coordinador encargado, el mismo se entregaba al señor Cruz Cabán para que procediera a documentar la actividad de limpieza de la compresora.

27. La actividad de limpieza de la compresora se realizaba a una hora posterior de la hora de impresión del *checklist*.

28. El término "backdating" se refiere a cuando se documenta la realización de una tarea con fecha u hora anterior a la fecha u hora en que, en realidad, se ejecutó la tarea.

29. Los GMPs no permiten el *backdating*.

30. El 16 de junio del año 2020, el señor Cruz Cabán fue entrevistado como parte de la investigación interna en curso ante la identificación de una discrepancia en la documentación de la limpieza de un "buffer" en un *checklist*, limpieza que ocurrió el día antes, 15 de junio de 2020.

31. La discrepancia objeto de la investigación mencionada consistió en que se documentaron ciertos pasos en el proceso de limpieza del "buffer" como ejecutados a una hora del 15 de junio de 2020 anterior a la hora de impresión del *checklist*.

32. El 15 de junio de 2020, el señor Cruz Cabán comenzó con el proceso de limpieza del "buffer" a las

6:50 a.m. Luego de haber comenzado con el proceso de limpieza, documentó en el *checklist* haber estado 2 minutos en el proceso de limpieza del buffer cuando el procedimiento correcto requiere que ese proceso de limpieza sea de 3 minutos.

33. El señor Cruz Cabán contactó al supervisor de turno al percatarse de ello, Enrique Díaz ("Díaz"), quien le proporcionó un segundo *checklist* para corregir el error.

34. Díaz le requirió al señor Cruz Cabán al entregarle el segundo *checklist* que debía repetir el proceso de la limpieza del "buffer".

35. En el segundo *checklist*, el señor Cruz Cabán documentó el proceso de re-limpieza del "buffer" como ejecutado a una hora anterior a la hora de impresión de ese segundo *checklist*. La fecha y hora de impresión del segundo *checklist* fue 15 de junio de 2020, a las 9:15 a.m.

36. El señor Cruz Cabán colocó "no aplica" o "n/a" a los pasos que ya había completado en el procedimiento de limpieza del "buffer" que habían sido documentados en el primer *checklist*.

37. El señor Cruz Cabán indicó en el paso 5 del segundo *checklist*, que realizó el drenaje a las 8:00 a.m., cuando dicho *checklist* se imprimió a las 9:15 a.m. Para estar en cumplimiento con las prácticas establecidas por BMS, el señor Cruz Cabán debió haber repetido el paso 5 y el segundo *checklist* debía reflejar la hora en que se repitió ese segundo drenaje.

38. Durante la investigación realizada sobre el particular, el señor Cruz Cabán afirmó que llevó a cabo la repetición del drenaje luego de haber recibido el segundo *checklist*, esto es, luego de las 9:15 a.m.; no obstante, en el *checklist* documentó que lo repitió entre las 8:05 y 8:07 a.m.

39. El señor Cruz Cabán incurrió en una desviación a las GMPs y GDPs al documentar la hora de la limpieza del segundo drenaje.

40. En el paso 8 del segundo *checklist*, el señor Cruz Cabán documentó que llevó a cabo ese paso de la limpieza del "buffer" entre 8:10 y 8:14 a.m.

41. Durante la investigación realizada sobre el particular, el señor Cruz Cabán indicó que arrastró el error en la documentación de los pasos anteriores al paso 8.

42. Durante la investigación realizada sobre el particular, el señor Cruz Cabán reconoció que esta acción conllevaba una desviación de las GMPs y GDPs, al indicar que no se fijó en la hora de impresión del segundo *checklist* ni de la hora local de la Planta al documentar la hora en que repitió el paso 8.

43. La entrevista realizada al señor Cruz Cabán, como parte de la investigación interna sobre las discrepancias en la documentación, estuvo a cargo de Rosa Gianoni, Global Investigation Senior Scientist de BMS, Jazmin Gómez, Senior QA Plant Support Specialist de BMS y Jennifer Alcover, Associate Director, Investigations Lead de BMS y se llevó a cabo el 16 de junio de 2020.

44. Durante la entrevista, el señor Cruz Cabán tuvo la oportunidad de contestar preguntas y ofrecer su versión de los hechos. Expresó que los hechos alegados por BMS fueron como consecuencia de un error humano.

45. Luego de concluida la entrevista del 16 de junio de 2020, el señor Cruz Cabán fue informado que podía continuar trabajando, pero no realizando las funciones de un Manufacturing Technician II.

46. El señor Cruz Cabán trabajó en BMS hasta el 7 de octubre de 2020.

47. El señor Cruz Cabán fue despedido en esa fecha, esto es, el 7 de octubre de 2020, como consecuencia de las discrepancias al documentar la repetición de la limpieza del "buffer".

48. El señor Cruz Cabán reconoce que su despido se debió a las discrepancias en documentación en que incurrió en el segundo *checklist* producto de un error humano.

49. Dentro de los factores que BMS toma en consideración para disciplinar a un empleado por incurrir en violaciones a los GMPs y SOPs se encuentran:

> (1) amonestaciones previas;
> (2) evaluaciones recientes;
> (3) el tipo de violación cometida;
> (4) la gravedad de la violación;
> (5) cual ha sido la disciplina en casos similares; y
> (6) el impacto o potencial impacto a las operaciones de la empresa y a su reputación.

50. Las violaciones a los GMPs y GDPs cometidas en la operación de BMS por el señor Cruz Cabán ocasionó, entre otros efectos, (1) paralización de la operación del área manejada por el querellante; (2) limpieza adicional del "buffer" por otro personal de la empresa; (3) inclusión de personal de otra área de la manufactura para asegurar el seguimiento de los procesos de manufactura para proteger la calidad del producto, así como personal del área de adiestramientos en BMS para involucrarse en la investigación de las violaciones; implantación por parte de la gerencia de acciones remediales para cubrir al personal removido de sus tareas del día a día en el piso y en adiestramientos; y (4) inversión en recursos para realizar la investigación correspondiente.

51. El costo de realizar la investigación interna requerida como consecuencia de las acciones del señor Cruz Cabán fue de $28,091.00.

52. El señor Cruz Cabán recibió amonestaciones previas relacionadas a desviaciones en los trámites con la documentación a su cargo.

53. El señor Cruz Cabán recibió amonestaciones el 23 de abril de 2015 y el 5 de septiembre de 2015. Luego, el 30 de septiembre de 2016, el señor Cruz Cabán recibió otra amonestación por violaciones a las GMPs y SOPs en cuanto a los procedimientos de limpieza de la maquina en cuestión.

53 (sic). El señor Cruz Cabán señala a Nydia Santana como la empleada a quien le fueron asignadas sus funciones luego de ser despedido.

54. El señor Cruz Cabán señala que a la fecha en que todavía era empleado de BMS, Nydia Santana ocupaba la posición de Empleada de Manufactura.

55. El señor Cruz Cabán entrenó a Nydia Santana para certificarse como Manufacturing Technician I.

El foro primario concluyó que el despido del señor Cruz Cabán fue justificado y consignó, además que éste no había establecido un caso *prima facie* de discrimen ni por represalias. Primeramente, coligió que Bristol había demostrado que el señor Cruz Cabán tenía la responsabilidad de seguir unos pasos específicos para la limpieza del "buffer" y, en dos ocasiones, no cumplió con tal gestión a cabalidad, por lo que la decisión de despedirlo no fue arbitraria ni caprichosa, sino que obedeció al interés de proteger un negocio altamente regulado y con estrictas normas de seguridad. Así pues, concluyó que existía causa justificada para el despido.

El TPI también determinó que el señor Cruz Cabán no estableció un caso *prima facie* de discrimen por edad, pues no presentó prueba que demostrara la concurrencia de los requisitos de la causa de acción. Por último, determinó que tampoco el señor Cruz Cabán había establecido un caso *prima facie* por represalias, por no haber participado en una actividad protegida. En su consecuencia, desestimó la demanda en su totalidad por insuficiencia de prueba.

Inconforme con dicho dictamen, el señor Cruz Cabán presentó una *Solicitud de Reconsideración Parcial* el 3 de noviembre de 2025, únicamente respecto a la causa de acción sobre despido injustificado.[11] En respuesta a esto, Bristol se opuso el 4 de noviembre de 2025.[12] La reconsideración fue denegada por el foro apelado mediante una *Orden* emitida el 4 de noviembre de 2025, y notificada y archivada en autos el 5 de noviembre de 2025.[13]

Insatisfecho aún, el señor Cruz Cabán presentó su recurso de apelación ante esta Curia el 5 de diciembre de 2025 y señaló que el TPI erró al:[14]

> Declarar ha lugar [a] la moción de sentencia sumaria presentada por la apelada y dictar sentencia sumariamente en la que desestimó la reclamación de despido injustificado del apelante, a pesar de existir controversias de hechos esenciales respecto a los incidentes que la apelada alegó como justificación del despido.

Por su parte, el 7 de enero de 2026, Bristol presentó su *Oposición a [la] Apelación*.[15] En síntesis, sostuvo que el foro primario no erró en su determinación, debido a que su exposición de hechos incontrovertidos se basó en la prueba que tuvo ante su consideración. Además, arguyó que el despido del señor Cruz Cabán fue uno justificado, ya que sus acciones "fraudulentas" de falsificación de documentos inciden sobre sus políticas internas y los GMPs que imperan sobre la industria farmacéutica porque el *backdating* está estrictamente prohibido. Así, razonó que el TPI resolvió correctamente al declarar que procedía dictar sentencia sumaria a favor de Bristol porque el señor Cruz Cabán no probó con suficiencia su reclamación.

---

[11] *Solicitud de Reconsideración Parcial, Íd.*, entrada 45.
[12] *Oposición a [la] Solicitud de Reconsideración Parcial y para que se Desglose del Récord la Referida Solicitud, Íd.*, entrada 46.
[13] *Orden, Íd.*, entrada 47.
[14] *Apelación*, SUMAC-TA en el recurso TA2025AP00636, entrada 1.
[15] *Oposición a [la] Apelación, Íd.*, entrada 3.

## II.

## A.

El mecanismo de sentencia sumaria, regulado por la Regla 36 de las de Procedimiento Civil,[16] le permite al tribunal disponer de un caso sin celebrar una vista en su fondo.[17]

La Regla 36.1 de las de Procedimiento Civil,[18] establece que una moción de sentencia sumaria debe estar fundada en declaraciones juradas o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes.[19] Por tanto, el tribunal podrá dictar sentencia sumaria si de las alegaciones, deposiciones, contestaciones, interrogatorios y admisiones ofrecidas, junto con las declaraciones juradas, si las hubiere, surge que no existe ninguna controversia real sobre los hechos materiales y esenciales del caso, y solo resta por resolver una controversia de estricto derecho.[20]

Por otro extremo, la sentencia sumaria resulta improcedente cuando: (1) existen hechos materiales y esenciales controvertidos; (2) haya alegaciones afirmativas en la demanda que no han sido refutadas; (3) surge de los propios documentos que se acompañan con la moción una controversia real sobre algún hecho material y esencial, o (4) como cuestión de derecho, no proceda.[21]

La parte promovida tiene el deber de refutar los hechos alegados con prueba que controvierta la exposición de la parte que

---

[16] 32 LPRA Ap. V, R. 36.

[17] *SLG Fernández-Bernal v. RAD-MAN et al.,* 208 DPR 310, 334 (2021); *León Torres v. Rivera Lebrón,* 204 DPR 20, 41 (2020); *Abrams Rivera v. E.L.A., 178 DPR 914, 932 (2010); *Nieves Díaz v. González Massas,* 178 DPR 820, 847 (2010); *Ramos Pérez v. Univisión*, 178 DPR 200, 213 (2010).

[18] 32 LPRA Ap. V, R. 36.1.

[19] *SLG Fernández-Bernal v. RAD-MAN et al.,* supra, pág. 335; *Rodríguez García v. UCA,* 200 DPR 929, 940 (2018).

[20] 32 LPRA Ap. V, R. 36.3(e); *León Torres v. Rivera Lebrón,* supra; *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 430 (2013); *Mejías et al. v. Carrasquillo et al.,* 185 DPR 288, 299 (2012); *Ramos Pérez v. Univisión,* supra, pág. 214; *González Aristud v. Hosp. Pavía,* 168 DPR 127, 137-138 (2006).

[21] *SLG Fernández-Bernal v. RAD-MAN et al.,* supra, págs. 335-336; *Mejías et al. v. Carrasquillo et al.*, supra, pág. 299; *Corp. Presiding Bishop CJC of LDS v. Purcell,* 117 DPR 714 (1986).

solicita la sentencia sumaria.[22] En este sentido, la parte que desafía una solicitud de sentencia sumaria no puede descansar en las aseveraciones o negaciones consignadas en su alegación. Dicha parte está obligada a controvertir la moción de su adversario de forma tan detallada y específica como lo ha hecho el promovente en su solicitud, ya que, de no hacerlo, corre el riesgo de que se dicte sentencia sumaria en su contra, de esto proceder en derecho.[23]

Sin embargo, el hecho de que la otra parte no presente prueba que controvierta la evidencia presentada por la parte promovente de la moción de sentencia sumaria, no implica necesariamente que dicha moción procederá automáticamente si realmente existe una controversia sustancial sobre hechos esenciales y materiales.[24]

Asimismo, toda inferencia que se haga de los hechos incontrovertidos debe efectuarse de la manera más favorable a la parte que se opone a esta.[25] A tono con este principio, el Tribunal Supremo ha indicado que, "[a]l considerar la moción de sentencia sumaria[,] se tendrán como ciertos los hechos no controvertidos que consten en los documentos y las declaraciones juradas ofrecidas por la parte promovente".[26]

En el caso de un foro apelativo, este debe utilizar los mismos criterios que el tribunal sentenciador para determinar si procede dictar sentencia sumaria, empero: (1) solo puede considerar los documentos que se presentaron ante el foro de primera instancia, y (2) solo puede determinar si existe o no alguna controversia genuina de hechos materiales y si el derecho se aplicó de forma correcta.[27]

---

[22] *SLG Fernández-Bernal v. RAD-MAN et al.,* supra, pág. 336; *León Torres v. Rivera Lebrón,* supra, pág. 44; *Ramos Pérez v. Univisión*, supra, pág. 215.

[23] *León Torres v. Rivera Lebrón,* supra, pág. 43.

[24] *SLG Fernández-Bernal v. RAD-MAN et al.,* supra, pág. 337.

[25] *Mejías et al. v. Carrasquillo et al.*, supra, pág. 300; *Corp. Presiding Bishop CJC of LDS v. Purcell,* supra, pág. 721.

[26] *Piñero v. A.A.A.,* 146 DPR 890, 904 (1998).

[27] *SLG Fernández-Bernal v. RAD-MAN et al.,* supra, págs. 337-338; *Const. José Carro v. Mun. Dorado*, 186 DPR 113, 129 (2012).

Así pues, por estar en la misma posición que el foro primario al momento de revisar las solicitudes de sentencia sumaria, el Tribunal Supremo de Puerto Rico estableció un estándar específico, que, como foro apelativo, debemos utilizar. A tales efectos, en *Meléndez González, et al. v. M. Cuebas*,[28] indicó que, de entrada, debemos revisar que tanto la moción de sentencia sumaria, así como su oposición, cumplan con los requisitos de forma codificados en la Regla 36 de las de Procedimiento Civil.[29] Subsecuentemente, si existen hechos materiales controvertidos, "el foro apelativo intermedio tiene que cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil y debe exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos".[30] Por el contrario, si encontramos que los hechos materiales del caso son incontrovertidos, debemos revisar *de novo* si el foro primario aplicó correctamente la norma jurídica aplicable a la controversia que tuvo ante sí.[31]

El modelo de sentencia sumaria por insuficiencia de prueba fue adoptado por el Tribunal Supremo en *Medina v. M.S. & D. Química P.R., Inc.*[32] Esta modalidad procede cuando la parte demandante no cuenta con evidencia suficiente para probar su caso.[33] Específicamente, el promovente debe establecer que: (1) el juicio en su fondo es innecesario; (2) el demandante no cuenta con evidencia suficiente para probar algún hecho esencial a su reclamación, y (3) como cuestión de derecho, procede la desestimación de la reclamación.[34]

No obstante, para disponer de un pleito por dicho fundamento es indispensable que se le haya brindado a la parte promovida

---

[28] 193 DPR 100 (2015).
[29] *Íd.*, pág. 118.
[30] *Íd.*, pág. 119.
[31] *Íd.*
[32] 135 DPR 716 (1994).
[33] *Rodríguez Méndez v. Laser Eye*, 195 DPR 769, 786 (2016).
[34] *Íd.*

amplia oportunidad para realizar un descubrimiento de prueba y que se demuestre que la prueba descubierta no satisface los elementos necesarios para sostener su causa de acción.[35] Por su lado, la parte promovida no puede evitar tal solicitud "por el mero pretexto de que, a pesar de no contar con evidencia suficiente para probar un elemento indispensable para su reclamación, merece su 'día en corte'."[36] Así que, para derrotar una moción de sentencia sumaria bajo la modalidad de la insuficiencia de la prueba, la parte promovida puede, entre otras cosas, presentar con su oposición una prueba admisible en evidencia o una prueba que pueda convertirse en admisible —aunque de momento no lo sea— o que dé lugar a una prueba admisible que demuestre que existe evidencia para probar los elementos esenciales de su caso; que hay prueba en el récord que puede convertirse en una prueba admisible que derrotaría la contención de insuficiencia del promovente; que la moción es prematura porque el descubrimiento es inadecuado, está a medias o no se ha realizado, o que este, por su naturaleza, no es un caso que conviene que se resuelva por el mecanismo expedito de la sentencia sumaria.[37]

Valga apuntar que, a la modalidad de sentencia sumaria por insuficiencia de la prueba, le aplican todos los principios que deben utilizarse por los tribunales al resolver una solicitud de sentencia sumaria.[38] Por ello, podrá dictarse sentencia sumaria solamente cuando no exista ninguna controversia real sobre los hechos materiales y esenciales del caso,[39] y, además, si en derecho procede el reclamo.[40] "[C]uando existe duda sobre si hay o no prueba

---

[35] *Íd.,* pág. 787.
[36] *Íd.*
[37] *Medina v. M.S. & D. Química P.R., Inc.,* supra, pág. 734.
[38] *Íd.*
[39] Un hecho material "es aquel que puede afectar el resultado de la reclamación de acuerdo [con el] derecho sustantivo aplicable". *Ramos Pérez v. Univisión*, 178 DPR 200, 213 (2010). A su vez, la controversia relacionada a un hecho material debe ser real, "por lo que cualquier duda es insuficiente para derrotar una Solicitud de Sentencia Sumaria". *Íd.*, págs. 213-214.
[40] *SLG Zapata-Rivera v. J.F. Montalvo,* supra.

suficiente o si hay una controversia de hecho, esta duda debe resolverse en favor de la parte promovida"[41].

Así pues, el mecanismo de sentencia sumaria es un remedio discrecional que procederá solo cuando el tribunal quede claramente convencido de que tiene ante sí documentos no controvertidos, que no existen controversias sobre hechos materiales y esenciales, y que, por lo tanto, lo que resta es aplicar el derecho, ya que una vista en los méritos resultaría innecesaria.[42]

Hay que señalar que una sentencia sumaria, por constituir una decisión en los méritos,[43] es el precedente de cosa juzgada cuando se opone entre partes debidamente relacionadas.[44] Por ello, se ha advertido que, antes de resolver una controversia por la vía sumaria, el juzgador habrá de ponderar cuidadosamente al respecto, pues "mal utilizada, puede prestarse para despojar a un litigante de su 'día en corte', principio elemental del debido proceso de ley".[45]

De otra parte, el Tribunal Supremo ha señalado que no es aconsejable dictar sentencia sumaria en casos cuyas controversias versan esencialmente sobre asuntos de credibilidad o involucren aspectos subjetivos, como lo es la intención, los propósitos mentales o la negligencia.[46] Sin embargo, también se ha dicho que ello no impide la utilización del mecanismo de sentencia sumaria en las reclamaciones que requieran elementos subjetivos o de intención cuando de los documentos que serán considerados en la solicitud

---

[41] *Medina v. M.S. & D. Química P.R., Inc.,* supra.

[42] *Vera v. Dr. Bravo*, 161 DPR 308, 334 (2004). Véase *González Santiago v. Baxter Healthcare*, 202 DPR 281, 290 (2019); *Pérez Vargas v. Office Depot*, 203 DPR 687, 699 (2019).

[43] El efecto de la aplicación de la doctrina de cosa juzgada es que la sentencia emitida en un pleito anterior impide que se litiguen posteriormente, entre las mismas partes y sobre las mismas causas de acción y cosas, las controversias ya litigadas y adjudicadas, y aquellas que se pudieron haber litigado. *Mun. De San Juan v. Bosque Real, S.E.,* 58 DPR 743, 769 (2003).

[44] *Vera v. Dr. Bravo*, supra, pág. 335.

[45] *González v. Alicea, Dir. Soc. Asist. Legal,* 132 DPR 638, 646-647 (1993).

[46] *Aponte Valentín et al. v. Pfizer Pharm.*, 208 DPR 263, 278 (2021).

de sentencia sumaria surja que no existe controversia en cuanto a los hechos materiales.[47]

**B.**

La Ley Núm. 80 de 30 de mayo de 1976, conocida también como la *Ley de Despido Injustificado*, según enmendada (Ley 80),[48] fue creada con el fin primordial de proteger, de manera más efectiva, el derecho del obrero puertorriqueño a la tenencia de su empleo. A su vez, procura desalentar la práctica de despedir a los empleados de forma injustificada y otorga a los trabajadores remedios justicieros y consustanciales con los daños causados por un despido injustificado.[49]

El Artículo 2 de la Ley Núm. 80, *supra*, establece, en lo atinente, que:

> Se entenderá por justa causa para el despido de un empleado aquella que no esté motivada por razones legalmente prohibidas y que no sea producto del mero capricho del patrono. Además, se entenderá por justa causa aquellas razones que afecten el buen y normal funcionamiento de un establecimiento que incluyen, entre otras, las siguientes:
>
> (a) Que el empleado incurra en un patrón de conducta impropia o desordenada.
> (b) Que el empleado incurra en un patrón de desempeño deficiente, ineficiente, insatisfactorio, pobre, tardío o negligente. Esto incluye incumplir con normas y estándares de calidad y seguridad del patrono, baja productividad, falta de competencia o habilidad para realizar el trabajo a niveles razonables requeridos por el patrono y quejas repetidas de los clientes del patrono.
> (c) Violación reiterada por el empleado de las reglas y reglamentos razonables establecidos para el funcionamiento del establecimiento siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado.
> (d) Cierre total, temporero o parcial de las operaciones del establecimiento. En aquellos casos en que el patrono posea más de una oficina, fábrica, sucursal o planta, el cierre total, temporero o parcial de las operaciones de cualquiera de estos establecimientos donde labora el empleado

---

[47] *Íd.*
[48] 29 LPRA sec. 185a *et seq.*
[49] Véase Exposición de Motivos de la Ley 80-1976, *supra*; *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 424 (2013); *Feliciano Martes v. Sheraton*, 182 DPR 368 (2011).

despedido, constituirá justa causa para el despido a tenor con este Artículo.

(e) Los cambios tecnológicos o de reorganización, así como los de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento y los cambios en los servicios rendidos al público.

(f) Reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido o con el propósito de aumentar la competitividad o productividad del establecimiento.[50]

Cabe destacar que, "la enumeración de escenarios que se consideran justa causa contenida en la Ley Núm. 80 no es taxativa".[51] Por consiguiente, la Ley Núm. 80, *supra,* no puede ser considerada como un código de conducta que contenga una lista de faltas claramente definidas y la sanción que corresponda a cada una.[52] Los patronos pueden aprobar reglamentos internos y normas de conducta en el lugar de trabajo que estimen necesarias y los empleados estarán sujetas a ellas, siempre que estos cumplan con un criterio de razonabilidad.[53]

De este modo, el mencionado estatuto fue aprobado con el fin primordial de proteger:

[D]e una forma más efectiva[,] el derecho del obrero puertorriqueño a la tenencia de su empleo mediante la aprobación de una ley que, a la vez que otorgue unos remedios más justicieros y consubstanciales con los daños causados por un despido injustificado, desaliente la incidencia de este tipo de despido.[54]

Los empleados que se puedan beneficiar de esta ley tienen que ser de comercio, industria o cualquier otro negocio o sitio de empleo que: (1) estén contratados sin tiempo determinado; (2) reciban una remuneración, y (3) sean despedidos de su cargo sin que haya mediado justa causa.[55] Se define como justa causa para el despido

---

[50] 29 LPRA sec. 185b.
[51] *SLG Torres-Matundan v. Centro Patología*, 193 DPR 920, 930 (2015).
[52] *Ortiz Ortiz v. Medtronic Puerto Rico Operations, Co.*, 209 DPR 759, 773 (2022), citando a *Srio. del Trabajo v. G.P. Inds., Inc.*, 153 DPR 223, 243 (2001).
[53] *Íd.*
[54] *Feliciano Martes* v. *Sheraton,* supra, pág. 379.
[55] *Rivera Figueroa* v. *The Fuller Bush Co.*, 180 DPR 894, 906 (2001).

la que tiene origen para el buen funcionamiento de la empresa y no al libre arbitrio del patrono.[56] Ahora bien, los patronos deben pagar una mesada a los empleados que son despedidos sin justa causa.[57] Todo despido que no fuese basado en una justa causa es considerado injustificado y en el cual el empleado recibe el beneficio de un remedio exclusivo.[58]

El Artículo 11 de la citada ley establecía, en su inciso (a),[59] lo siguiente:

> [e]n toda acción entablada por un empleado reclamando los beneficios dispuestos por las secs. 185a a 185m de este título, **el patrono vendrá obligado a alegar, en su contestación a la demanda, los hechos que dieron origen al despido y probar que el mismo estuvo justificado para quedar eximido de cumplir con lo establecido en la sec. 185a de este título**.[60]

Así, bajo el referido estatuto, el patrono tiene el peso probatorio de demostrar que el despido fue uno justificado por medio de preponderancia de la prueba, de lo contrario se presume que fue injustificado.[61] Como cuestión de umbral, para que el empleado se beneficie de la presunción, debe demostrar que fue empleado de un comercio, industria u otro negocio; que su contrato era por tiempo indeterminado; que recibía remuneración por su trabajo, y que fue despedido de su puesto.[62]

Una vez activada la presunción estatutaria a favor del empleado, el patrono tiene el deber de presentar prueba para rebatir la presunción y, además, persuadir al juzgador mediante preponderancia de la evidencia.[63] En tal sentido, "los temas de carga de prueba y presunciones son inseparables".[64]

---

[56] *Srio. del Trabajo* v. *I.T.T.*, 108 DPR 536, 542 (1979).
[57] *SLG Zapata* v. *J.F Montalvo*, supra, pág. 424.
[58] *Díaz* v. *Wyndham Hotel Corp.*, 155 DPR 364, 378 (2001).
[59] 29 LPRA sec. 185k
[60] *Íd.* (Énfasis suplido).
[61] *Díaz* v. *Wyndham Hotel Corp.,* supra, pág. 388.
[62] *Rivera Figueroa* v. *The Fuller Bush Co.*, supra, pág. 907.
[63] *Íd.*, pág. 911
[64] *Íd.*, pág. 913, citando a E.L. Chiesa Aponte, *Tratado de derecho probatorio: Reglas de evidencia de Puerto Rico y federales*, República Dominicana, Ed. Corripio, 1998, T. II, pág. 1088.

Sin embargo, la *Ley de Transformación y Flexibilidad Laboral,* Ley Núm. 4-2017 (Ley 4-2017), enmendó varias disposiciones de la Ley Núm. 80, *supra.* En lo aquí concerniente, una de las enmiendas aprobadas fue el orden de prueba, puesto que se eliminó el inciso (a) del Artículo 11 de la Ley 80, *supra.* Esta contenía la frase que le imponía al patrono el peso de la prueba.[65]

Ahora bien, el Artículo 1.2 de la Ley 4-2017, *supra,* expresa lo siguiente:

> Los empleados contratados con anterioridad a la vigencia de esta Ley, continuarán disfrutando los mismos derechos y beneficios que tenían previamente, según lo dispuesto expresamente en los Artículos de ésta.

En *Ortiz Ortiz v. Medtronic Puerto Rico Operations, Co.,* supra, el Tribunal Supremo resolvió que los efectos de las enmiendas a la Ley 80, *supra,* ante la aprobación de la Ley 4-2017, *supra,* no tienen efecto retroactivo.[66] Así y respecto al asunto del orden de prueba, la Alta Curia expuso lo siguiente:

> Luego de analizar minuciosamente las disposiciones estatutarias pertinentes, la intención legislativa y el principio jurídico de la irretroactividad de las leyes, coincidimos en este asunto con la aplicación efectuada por el tribunal apelativo intermedio, pues la disposición enmendada no es de aplicación retroactiva.

> En vista del marco de derecho antes reseñado, la disposición aplicable es la que se encontraba vigente al momento de los hechos que dieron lugar a la causa de acción por despido injustificado.[67]

**III.**

En el caso de marras, debemos resolver si procedía desestimar la reclamación por despido injustificado incoada por el señor Cruz Cabán por insuficiencia de la prueba y declarar ha lugar a la *Moción de Sentencia Sumaria* presentada por Bristol.

---

[65] *Íd.,* pág. 776.
[66] *Ortiz Ortiz v. Medtronic Puerto Rico Operations, Co.,* supra, pág. 781.
[67] *Íd.*

A juicio del foro primario, el señor Cruz Cabán no probó con suficiencia su reclamo de despido injustificado contra Bristol. Concluyó así que procedía la desestimación de la querella por insuficiencia de la prueba. Especificó que el señor Cruz Cabán incumplió con su responsabilidad de cumplimiento estricto con las instrucciones del proceso de documentación de la limpieza del *buffer*. Esbozó que el despido del apelante fue justificado porque la ejecución de sus funciones fue negligente, lo cual se alejó de los estándares, normas y políticas de Bristol y de la industria farmacéutica en general, debido a que el *backdating* está prohibido y esto hubiese sido causa suficiente para despedirlo. Adujo así que la gravedad de la gestión yació en la inobservancia del señor Cruz Cabán sobre las políticas regentes sobre la industria farmacéutica; puntualizó entonces que la falta de cuidado del señor Cruz Cabán se debió a un error humano, pero que la acción de Bristol obedeció a la rigurosidad requerida por la industria para proteger el negocio, tomando en consideración las amonestaciones previas que había recibido el apelante.

Inconforme, el señor Cruz Cabán planteó que el foro primario estaba impedido de dictar sentencia sumaria a favor de Bristol porque habían hechos en controversia que se debían dirimir en un juicio. Por los fundamentos a continuación, *confirmamos* la *Sentencia* apelada.

Como hemos expuesto anteriormente, el primer y segundo paso del estándar que este Tribunal debe utilizar para revisar la concesión o denegatoria de una solicitud de sentencia sumaria es una revisión *de novo* del expediente del caso de epígrafe y corroborar que tanto la solicitud como la oposición a sentencia sumaria cumplan con los requisitos de la Regla 36 de las de Procedimiento

Civil.[68] De una lectura cuidadosa de la solicitud de sentencia sumaria presentada por Bristol y de la oposición del señor Cruz Cabán, **colegimos que estos escritos *cumplen* con los requisitos dispuestos por la Regla 36.3 (a) de las de Procedimiento Civil, *supra*.**[69] Específicamente, la petición y su oposición contienen una exposición breve de las alegaciones de las partes; los asuntos litigiosos o en controversia; la causa de acción, reclamación o parte respecto a la cual es solicitada la sentencia sumaria; una relación concisa, organizada y en párrafos enumerando todos los hechos pertinentes y esenciales sobre los cuales no existe controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible, así como cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal, las razones por la cuales debe ser dictada la sentencia sumaria con derecho aplicable y el remedio que debe ser concedido.

En el presente caso, después de un examen cuidadoso de la solicitud de sentencia sumaria, sus documentos complementarios y el resto del expediente, concluimos que no existen hechos materiales en controversia o que pudiesen afectar el resultado de las reclamaciones de acuerdo con el derecho sustantivo aplicable.

**Según mencionamos en la sección anterior, el oponente a la moción de sentencia sumaria está obligado a establecer que existe una controversia que sea real, por lo cual cualquier duda es insuficiente para derrotar el petitorio sumario.** Al momento de controvertir los hechos propuestos por la otra parte, el oponente posee el peso para presentar evidencia sustancial que apoye los hechos materiales que arguye están en controversia. **En otras palabras, *no* puede descansar en meras aseveraciones o**

---

[68] Regla 36 de las de Procedimiento Civil, *supra*.
[69] *Íd.*

**negaciones de sus alegaciones, sino que debe proveer contradeclaraciones juradas y documentos que sustenten los hechos materiales en disputa.**

En el caso del apelante, no surge de la *Querella* o de la oposición a la sentencia sumaria ni un solo hecho específico o documento sobre acto alguno que indique que el despido del señor Cruz Cabán fue uno injustificado. Esto se debe a que Bristol le garantizó su debido proceso al señor Cruz Cabán durante la investigación del incidente ocurrido el 15 de junio de 2020, donde el apelante incurrió en *backdating* al documentar mal el tiempo y hora de limpieza de una pieza de una maquinaria a su cargo. También, el señor Cruz Cabán admitió que su negligencia se debió a un error humano que no tuvo mayor impacto sobre la compañía, aunque sí reconoció que el *backdating* es una práctica prohibida en la industria farmacéutica y que tal acción pudiese conllevar una remoción definitiva de su puesto. Asimismo, el señor Cruz Cabán delineó que tuvo faltas previas durante sus veinte (20) años de empleo con Bristol, pero que dos (2) de ellas se debieron a problemas con su asistencia y solo una (1) fue por pobre desempeño en sus labores; enfatizó que la amonestación por desempeño insatisfactorio fue en 2016. No se desprende de los anejos que el despido del señor Cruz Cabán haya sido uno arbitrario o haya obedecido a alguna práctica discriminatoria; fue despedido luego de la culminación de la investigación del incidente aludido, aunque ya este había sido removido de sus labores regulares mientras el protocolo corría su curso.

En sentido contrario, Bristol logró establecer mediante senda prueba documental y declaraciones juradas el hecho de que el despido del señor Cruz Cabán fue uno justificado. Luego de que el señor Cruz Cabán le notificó a su supervisor sobre su segundo error en la documentación en los tiempos del *checklist* el 15 de junio de

2020, este fue separado de sus funciones y asignado otras tareas mientras se repetía la limpieza del *buffer* y se comenzaba el proceso de investigación del incidente. El 16 de junio de 2020, el señor Cruz Cabán fue entrevistado por el personal encargado de la investigación, lo cual le dio la oportunidad de ofrecer su versión de lo acontecido. Al culminar la investigación, el señor Cruz Cabán fue despedido el 7 de octubre de 2020. Coincidimos con el foro apelado cuando este determinó que el despido fue razonable, debido a que la conducta incurrida por el apelante es una terminantemente prohibida por los cuerpos regentes sobre la industria farmacéutica y porque la negligencia del apelante obedecía a un patrón y no solo a un incidente aislado.

Es imperativo recordar también que, el Artículo 2 inciso (b) de la Ley 80, *supra*, indica que es justificado el despido que se da a raíz de que "el empleado incurra en un patrón de desempeño deficiente, ineficiente, insatisfactorio, pobre, tardío o **negligente**. Esto incluye **incumplir con normas y estándares de calidad y seguridad del patrono**…".[70] Dicho de otro modo, el despido de un empleado que incumpla *consistente* y *negligentemente* con los estándares de calidad que regulan al patrono es uno justificado según nuestras leyes.

Colegimos, pues, que el foro primario no erró al declarar que la petición de sentencia sumaria de Bristol era procedente y desestimar la reclamación a su favor. En consecuencia, se *confirma* la fundamentada *Sentencia* apelada.[71]

---

[70] 29 LPRA sec. 185b.

[71] A pesar de nuestro dictamen, nos parece meritorio resaltar que en la *Oposición a [la] Apelación* y en la réplica a la oposición de la disposición sumaria del caso constan expresiones como "la gimnasia nada tiene que ver con la magnesia", "que BMS no opera un cafetín ni una zapatería", "otros 20 pesos", "casi na", "para no aburrir aquí a este Honorable Tribunal", "se le fue la guagua", "hay que comparar chinas con chinas y no chinas con guineos", entre otras, junto con comentarios despectivos hacia la representación legal del apelante. Le recalcamos a los licenciados Carl Schuster y Daniel Quiles Pumarejo que todo abogado ha de ostentar un temple calificado por la mayor deferencia y cortesía hacia los foros judiciales; así, les invitamos y *exhortamos* a la representación del apelado a

**IV.**

En virtud de lo anterior, se *confirma* la *Sentencia* apelada.

Notifíquese.

Lo acuerda y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda.  Lilia M. Oquendo Solís<br>
Secretaria del Tribunal de Apelaciones

---

reflexionar y reconsiderar el uso de tal lenguaje en sus escritos jurídicos subsiguientes.